# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### CHATTANOOGA

| | | |
|---|---|---|
| RODNEY LYNN KILGORE, | § | |
| | § | |
| *Plaintiff,* | § | No. _____ |
| | § | |
| ~v~ | § | |
| | § | **JURY TRIAL DEMANDED** |
| TOWN OF MONTEAGLE, | § | |
| | § | |
| ALHAFIZ IBN KARTERON, | § | |
| | § | |
| WILLIAM RALINE, and | § | |
| | § | |
| TREVA BAKER, | § | |
| | § | |
| *Defendants.* | § | |

## <u>COMPLAINT</u>

Plaintiff Rodney Lynn Kilgore, through counsel, and complaining of Defendants TOWN OF MONTEAGLE ("Monteagle"), ALHAFIZ IBN KARTERON ("Karteron"), WILLIAM RALINE ("Raline"), and TREVA BAKER ("Baker"), for his causes of action, will show the Court:

## INTRODUCTION

1.    This is an action to redress for violations of rights secured to the Plaintiff under the United States Constitution arising from the misconduct of Karteron, Raline, Baker, and Monteagle.

2.    This civil rights action is brought under 42 U.S.C. §1983 against Karteron, Raline, and Baker in their individual and official capacities and against Monteagle.

3. This action seeks damages against all defendants caused by the violations of the Plaintiff's constitutional rights as set forth more fully *infra*.

4. This action also raises state law claims against Karteron, Raline, and Baker in their individual capacities.

5. Plaintiff seeks compensatory, nominal and punitive damages against Karteron, Raline, and Baker in their individual capacities. Plaintiff seeks compensatory and nominal damages against Monteagle.

## JURISDICTION AND VENUE

6. Plaintiff's claims for relief are predicated upon 42 U.S.C. §1983, which authorizes actions to redress the deprivation, under color of state law, of rights, privileges, and immunities secured to the Plaintiff by the United States Constitution. This action arises under the First, Fourth, and Fourteenth Amendments to the United States Constitution. Thus, as to the § 1983 claims, this Court is vested with original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

7. This Court is vested with supplemental jurisdiction over Plaintiff's state claims pursuant to 28 U.S.C. § 1367 in that all claims set forth herein arise from the same case and controversies.

8. Venue is proper in this Court, Chattanooga Division, pursuant to 28 U.S.C. §1391(B). All acts complained about occurred within Marion County, a political sub-division of the State of Tennessee physically located within the fourteen-county district of this Court.

## THE PARTIES

9. Plaintiff is a United States citizen and a resident of Tennessee.

~ 2 ~

10. Monteagle is a municipality formed under the laws of the State of Tennessee.

11. Monteagle's government was created by Tennessee State Law as seen in Tennessee Code Annotated Title 6, Part 1 through 3. Specifically, Monteagle's controlling government structure is a Board of Mayor and Aldermen comprised of a mayor and four aldermen (hereinafter "Board").

12. The Board acts as the legislative branch of government for Monteagle and establishes policy for Monteagle.

13. The Mayor cannot single-handedly create policy, but the Mayor can influence policy through his/her duty to supervise all town affairs and employees. The Mayor also has the duty to ensure all town laws, regulations, and ordinances are followed.

14. Pursuant to TENN. CODE ANN. § 6-3-106(b)(1), and (2), the Mayor has final authority (which the Mayor may designate to a department head) to employ, promote, discipline, and discharge all employees in accordance with personnel policies and procedures if any are adopted by the Board.

15. At all relevant times, Monteagle employed Karteron as a police officer with the supervisory rank of sergeant. At all relevant times, Karteron acted under color law.

16. At all relevant times, Monteagle employed Raline as a police officer with the supervisory rank of chief-of-police. At all relevant times, Raline acted under color law.

17. At all relevant times, Baker, acted under color of law when she acted in concert with Karteron and Marion County deputies to commit the violations as set forth herein.

18. At all relevant times, Monteagle was responsible for the creation, maintenance, and supervision of the town's police department, which is a law enforcement agency created under Tennessee state law and regulated by the laws of the State of Tennessee as to the hiring, training, certification, and discipline of its law enforcement employees.

19. At all relevant times, Karteron was responsible for the safety and welfare of the Plaintiff; was under a lawful obligation to refrain from violating the Plaintiff's constitutional rights; was under a lawful obligation to not conspire to violate Plaintiff's rights; was under a lawful obligation to refrain from the infliction of emotional distress upon the Plaintiff; and was under a lawful obligation not to assault and batter the Plaintiff.

20. At all relevant times, Raline was responsible for the safety and welfare of the Plaintiff; was under a lawful obligation to refrain from violating the Plaintiff's constitutional rights; was under a lawful obligation to not conspire to violate Plaintiff's rights; was under a lawful obligation to refrain from the infliction of emotional distress upon the Plaintiff; and was under a lawful obligation to supervise and prevent Karteron from violating Plaintiff's rights.

21. At all relevant times, Baker was under a lawful obligation to refrain from violating the Plaintiff's constitutional rights; was under a lawful obligation to

~ 4 ~

refrain from conspiring with Karteron to violate Plaintiff's constitutional rights; and she was under a lawful obligation to refrain from the infliction of emotional distress upon the Plaintiff.

22.     Plaintiff sues Karteron, Raline, and Baker in their individual capacities and official capacities and sues Monteagle.

**FACTUAL BASIS**

23.     At all times relevant, Plaintiff owned two businesses in the Town of Monteagle named Monteagle Truck and Tire and Monteagle Wrecker Service, and in the business of repairing motor vehicles, including semi-tractor trailers. Plaintiff was also in the business of towing motor vehicles, including semi-tractor trailers[1].

24.     Plaintiff conducted business in the greater Chattanooga, Tennessee area. Plaintiff was on the rotation list to tow vehicles with the City of Chattanooga. Plaintiff also conducted business in Northwest Georgia. Plaintiff was on the rotation to tow vehicles with the Georgia State Patrol and the City of Trenton, GA.

25.     As a condition of conducting business with the entities as stated in the previous paragraph, Plaintiff could not have a conviction for any felony.

*September 15, 2025 Incident*

26.     On September 15, 2025, Henry Mouton ("Mouton") arrived at Plaintiff's business for work to be done to a semi-tractor trailer.

27.     Plaintiff performed the work, but Mouton refused to pay the bill.

---

[1] Hereinafter referred to as "business."

~ 5 ~

28.   Throughout the encounters stated herein, Mouton freely walked about the Plaintiff's business property and was free to leave on foot or by other means.

29.   Plaintiff called Monteagle Police, and Karteron arrived.

30.   After some discussions between Plaintiff, Mouton, and Karteron about payment for the services, Plaintiff refused to allow Mouton to take the vehicle without full payment.

31.   Karteron used his cell phone to call Raline. Karteron told Raline that Plaintiff would not let Mouton take the vehicle, and Karteron told Raline that he did not know what to do.

32.   Raline told Karteron that "he's got Rodney's ass." He also told Karteron that Plaintiff did not tow the vehicle. Raline told Karteron that the matter was a civil matter and that Plaintiff could not keep Mouton from taking the vehicle and that Plaintiff committed false imprisonment. Raline told Karteron to tell Plaintiff he must let Mouton take the vehicle or "go to jail for false imprisonment."

33.   After the Karteron's call with Raline, Plaintiff used his own pickup truck to block Mouton's vehicle to prevent Mouton from taking the vehicle without full payment. Mouton was not in the vehicle at this time. Karteron approached Plaintiff and placed him under arrest for false imprisonment.

34.   Tennessee law allows Plaintiff to keep possession of a motor vehicle until the party receiving mechanic's service (such as what Plaintiff performed in this matter) pays for the service. This law is known as a "mechanic's lien" and is found in Tennessee common law and in TENN. CODE ANN. § 66-19-101, *et seq.*

35. On January 6, 2026, in a subsequent preliminary hearing before the Court of General Sessions for Grundy County, Tennessee (by interchange) ("the hearing") Karteron's knowledge as to a mechanic's lien was limited to a mechanic can hold a vehicle but only "after they file some paperwork because there's money due on the vehicle."

36. In the same hearing Karteron testified that by merely blocking Mouton's vehicle Plaintiff committed the crime of false imprisonment.

37. When confronted during the same hearing that Tennessee courts have held that false imprisonment required actual physical restraint of the person of a victim, Karteron replied: "That's not how I interpret that statute."

38. During the same hearing, Karteron conceded that Plaintiff did nothing to physically prevent Mouton from walking away from Plaintiff's place of business.

39. After Karteron arrested Plaintiff, he cuffed Plaintiff with his hands behind his back and placed him into Karteron's hot police vehicle. Karteron then turned on the car heater, which increased the temperature inside the policed vehicle.

40. Despite three Monteagle officers being present (Sgt. Raby and Raline arrived after the arrest) none of the officers were outside to monitor Plaintiff as he sweltered in the police vehicle. Rather, they went into Plaintiff's business.

41. While inside of the police vehicle, Plaintiff became overheated and called out to Karteron to get relief from the heat.

~ 7 ~

42. Karteron walked over to the police vehicle. Karteron falsely testified at the hearing that he saw Plaintiff kick the door and that the door was buckling outward and that the vehicle was "rocking back and forth." Bodycam video did not show the door or the vehicle moving in the manner as claimed by Karteron.

43. Karteron removed the Plaintiff from the police vehicle, and there were footprints on the door. Plaintiff told Karteron that it was hot in the police vehicle. To be sure, Plaintiff was trying to get one of the three officers' attention to get some relief from the heat from the sun and from the police vehicle heater.

44. Karteron then and without lawful justification physically abused the Plaintiff by needlessly tightening the handcuffs on the Plaintiff and forced the Plaintiff face-down. Then and without lawful justification, Karteron shoved the handcuffed Plaintiff backward and hard into the police vehicle causing Plaintiff further injury. Karteron falsely claimed that Plaintiff was trying to flee.

45. In the hearing, Karteron falsely testified that the A/C was "wide open" the whole time. However, the same bodycam footage showed that Karteron did not turn the A/C on until after he placed the Plaintiff back into the vehicle the second time and after he physically abused the Plaintiff.

46. Karteron failed to seek medical treatment for Plaintiff's injuries despite Plaintiff's request for medical assistance. Rather, Karteron claimed that Plaintiff would receive medical treatment at the county jail.

~ 8 ~

47.    Karteron, maliciously and without probable cause charged Plaintiff with crimes of false imprisonment, vandalism, and resisting arrest. Plaintiff posted bond and was released from jail.

48.    On September 17, 2025, Tina Coker ("Coker") posted Kareton's bodycam footage of the incident to a public Facebook page called "Monteagle Bulletin Board."

      a.    Coker is unknown to the Plaintiff, and based upon Plaintiff's information and belief, is not a member of Monteagle government.

      b.    In a Board meeting dated February 23, 2026, Plaintiff appeared and addressed the Board about the release of the footage while Plaintiff's criminal case was still pending.

      c.    Plaintiff told the Board and Raline that the release of the footage caused him harm to his business.

      d.    Raline admitted that he provided the footage pursuant to a "FOIA" request.

      e.    Nate Wilson, a member of the Board, told Plaintiff that providing the footage was proper. At no time did any member of Monteagle government apologize to the Plaintiff for the improper release.

~ 9 ~

f. The Tennessee Public Records Act (TENN. CODE ANN. § 10-7-503) allows for the inspection of municipal records *unless otherwise provided by state law*.

g. The Tennessee Supreme Court in <u>Brewer v. Metro. Gov't of Nashville and Davidson County</u>, 2026 WL 296548 (2026) (slip op), and <u>Tennessean v. Metro. Gov't of Nashville</u>, 485 S.W.3d 857 (Tenn. 2016) has held that Rule 16 of the Tennessee Rules of Criminal Procedure exempts disclosure of law enforcement's investigative files which "are open and are relevant to pending or contemplated criminal action."

h. Accordingly, requestors relying on the TPRA cannot gain access to "materials subject to discovery between the State and a defendant during the pendency of the criminal case or any collateral challenges to the criminal conviction." <u>Tennessean v. Metro. Gov't of Nashville</u>, 485 S.W.3d 857, 873 (Tenn. 2016)

49. On January 6, 2026, Court dismissed the charge of false imprisonment upon finding no probable cause after taking evidence at the hearing.

50. The Grand Jury for Marion County subsequently issued a no-bill of indictment on the charges of vandalism and resisting arrest.

<u>*September 18, 2025 Incident*</u>

51. Karteron and Baker reside together. They have never been married.

~ 10 ~

52. On September 18, 2025, Baker made a false claim to Deputy Chance Ladd ("Ladd") of the Marion County Sheriff's Office that the Plaintiff approached Baker and "scared" Baker.

53. Rather, Plaintiff was a customer at a food truck where Baker was working. Plaintiff had no idea Baker was anything to Karteron

54. Karteron falsely stated to Ladd that Baker and Karteron were married.

55. Based upon the false claims of Baker and Karteron, Ladd obtained an arrest warrant for Plaintiff's arrest on the felony charge of Retaliation for Past Action, TENN. CODE ANN § 39-16-510.

56. The pertinent element of the crime of Retaliation for Past Action in this instance is that Baker must be a "family member" and in this instance "an individual's spouse."

57. Based upon the false claims of Baker and Karteron, the judge of the Marion County Court of General Sessions issued a no contact order to wit (in part) that Plaintiff was to have no contact with *"Sgt. Karteron or his wife Treva Baker and their residence and real property."*

58. Despite Karteron's and Baker's full knowledge of the falsity of their claims, neither defendant took any action to correct the no contact order.

59. Prior to the hearing, Karteron was served with a subpoena to produce he and Baker's marriage certificate and marriage license.

60. Karteron failed to comply with the subpoena.

61.     On January 6, 2026, prior to the hearing, the State of Tennessee dismissed the charge of Retaliation for Past Action without any conditions. The Court set aside the no-contact order as the case was dismissed.

*Town of Monteagle Board Meeting October 27, 2025*

62.     Plaintiff and Jill Nunley attended a Board meeting where Board member Dan Sergeant ("Sergeant") and Town Mayor Greg Maloof ("Mayor") raised an issue of Karteron's qualifications to be a police officer.

63.     Sergeant referred to a document from "Rutherford County" that indicated Karteron was not fit to be a police officer.

64.     Karteron once worked for the Murfreesboro Police Department ("MPD") located in Rutherford County, Tennessee.

65.     MPD police chief James K. Durr ("Durr") terminated Karteron for his misrepresentation of the nature of a criminal conviction during the hiring process for MPD. A copy of the letter is attached to this Complaint and is incorporated herein.

66.     Specifically, Durr noted that Karteron disclosed that he had been charged with simple assault and that the charge was expunged from his record.

67.     However, Durr noted that further investigation revealed that the original charge as for Aggravated Assault, a Class C Felony; that the victim was seriously injured; and that Karteron served 90 days in the Rutherford County Jail.

68. Durr also noticed Karteron that he was decommissioning Karteron from his position as a law enforcement officer with MPD. That notice is attached hereto and incorporated into the Complaint.

69. When questioned by Sergeant and Nunley about the issue with Karteron, Raline replied that the charge against Karteron was dismissed; that Karteron was on diversion; that the charge "never happened;" and that POST Commission issued a letter or provided notice to Raline that Karteron was allowed to remain a police officer.

70. When Sergeant asked Raline to see the notice, Raline referred Sergeant to contact the POST Commission.

71. Raline further stated that POST Commission told him that there was nothing POST Commission could do because Karteron's criminal conviction was expunged, and thus the crime did not happen.

72. Sergeant retorted that the incident did happen, and Raline replied that he understood.

73. Sergeant noted that Karteron was "over zealous" and that his past criminal history was a "red flag."

74. Raline continued to make excuses for Karteron, by starting to say, "[Karteron] has not shown….." Then Raline admitted that Karteron was not "everyone's cup of tea," while painting Karteron was someone who cares about the citizens of Monteagle.

75. As of the date of this Complaint, no one associated with Monteagle government has taken any steps to address Karteron's prior history of violent behavior, to include terminating his employment with Monteagle.

76. Such an investigation by Monteagle could have begun with the document initially noted by Sergeant, and would have resulted in disclosure of an extensive investigation by MPD, (which is easy to obtain and is attached hereto) that found:

a. Middle Tennessee State University Police ("MTSUPD") investigated an MTSU employee (Brittany Shelton, "Shelton") for bringing a firearm onto campus and Shelton blamed Karteron as the suspect who placed the firearm in her car. When questioned by MTSUPD about the firearm, Karteron invoked his right to counsel. MTSUPD learned from Shelton that she had obtained an order of protection against Karteron after the incident.

b. The investigation determined that Karteron's aggravated assault victim required helicopter medical evacuation to Vanderbilt Hospital.

c. The investigation determined that Karteron did not disclose his arrest for aggravated assault when he applied to MPD, and he claimed in this job application with MPD that he was never arrested for violation of any law since he was 18 years old.

d.  Chief Durr notified Karteron, "Had this information been fully disclosed during the hiring process, we would have not offered you a conditional letter of employment. In addition, we would have been required to obtain a waiver from Peace Officers Standards and Training Commission (POST) of its pre-employment before you could be POST certified." "Due to the nature of the incident, had we known this information, we would have not applied for a waiver."

77.  During the meeting, a person known to Plaintiff as Tony Gilliam ("Gilliam") raised his past incidents involving Karteron and his inability to file complaints with the police department. Gilliam also discussed an incident with Karteron as Gilliam was entering the meeting. Rather than address the issue, Raline accused Gilliam of making inappropriate comments to Karteron.

### *November 4, 2025 Incident.*

78.  Plaintiff, a business owner with a long-standing interest in town affairs and attends Board meetings frequently.

79.  Plaintiff and Nunley attempted to participate in the Board meeting of November 4, 2025.

80.  Karteron approached Plaintiff and Nunley and told Plaintiff he could not attend the meeting because of a "no contact order." Karteron was screaming and aggressive toward Plaintiff and Nunley. Karteron's behavior placed Plaintiff and Nunley in fear that Karteron would arrest Plaintiff and cause Plaintiff more physical harm.

~ 15 ~

81.     Plaintiff elected to leave, and Nunley went inside to the meeting.

*Town of Monteagle Board Meeting February 23, 2026*

82.     Two members of the community, Scott Pilkington ("Pilkington") and another known to Plaintiff as Tony Gilliam ("Gilliam") raised issues about the difficulty of filing complaints with Raline and the police department over misconduct of its officers.

83.     Pilkington recounted an incident where Raline became involved with a matter involving Pilkington and the Grundy County Sheriff's office. In that incident, Pilkington was arrested by Grundy County deputies at the demand of Raline, and the charge of *false imprisonment* eventually dismissed.

        a.      The incident with Pilkington was a similar situation where the purported victim (Pilkington's wife) was free to move about, but Pilkington had blocked his wife's vehicle to prevent the wife from leaving with Pilkington's dogs.

84.     Raline stated that he was present "per an agreement" with Grundy County Sheriff's office.

85.     Pilkington stated to the Board that Raline refused to take his complaint about his and other Monteagle officers' involvement. Raline had told Pilkington he had no recourse with Monteagle, and he had to take it up with Grundy County. It wasn't until Dean Lay ("Lay"), an alderman and board member, asked Raline to provide the documents to facilitate Pilkington's complaint, and Raline provided the documents to Pilkington during the meeting. Based upon

~ 16 ~

information and belief, there has been no resolution of Pilkington's claims against Raline.

86. During the meeting, Gilliam raised an issue where he wanted to file a complaint with members at City Hall and not with the police department. Gilliam stated that he attempted to file a complaint and spoke with Raline about his issues with officers but that speaking with Raline "it was like, talking with that camera there" and a waste of time with Raline. Gilliam also expressed he was intimidated by officers when he went to the police department office to file a complaint.

87. Lay raised issue with Raline about citizens questioning the conduct of officers and that citizens would feel intimidated to go to the department.

## COUNT ONE:

### SEIZURE WITHOUT PROBABLE CAUSE
### (FOURTH AMENDMENT)

### September 15, 2025 Incident.

### VIOLATION OF CIVIL RIGHTS UNDER
### COLOR OF LAW 42 USC § 1983
### [Against Karteron, Raline, and Monteagle]

88. Each paragraph of this Complaint is incorporated as if fully set forth herein.

89. The Fourth Amendment to the United States Constitution protects persons from unreasonable seizures without probable cause.

90. Plaintiff, by operation of Tennessee law, was lawfully in possession of the semi-tractor trailer operated by Mouton, and Plaintiff had no duty to return the

~ 17 ~

vehicle to Mouton without payment despite Karteron and Raline's demands and threats.

91.    Karteron was fully aware that Mouton was free to leave at any time. Raline's "legal analysis" and command to Karteron was without probable cause.

92.    Despite his full knowledge that Mouton was free to leave, Karteron seized Plaintiff and charged him with the crime of false imprisonment.

93.    Karteron falsely claimed that Plaintiff was "rocking" the police vehicle and falsely claimed that Plaintiff was causing the door to "buckle" outward and that Plaintiff vandalized the door. Karteron falsely claimed Plaintiff tried to flee and was resisting arrest. With his full knowledge of his fabrication, Karteron charged Plaintiff charged Plaintiff with the crimes of vandalism and resisting arrest.

94.    Raline directed Karteron to make the criminal charge of false imprisonment against Plaintiff.

95.    No reasonable officer would have acted in this manner.

96.    Monteagle, despite its full knowledge of Karteron's past violent criminal history, continues to employ Karteron despite its full knowledge that the false imprisonment charge was dismissed; that the charge of retaliation was dismissed by the state; and that the resisting arrest and vandalism charges were no-billed by the Marion County Grand Jury. Karteron's past history of fabrications to Murfreesboro Police demonstrated a pattern of fabrication and thus his false statements were intentional, and this past history was known to Monteagle.

97. Monteagle has a pattern and practice of failure to facilitate citizen complaints, failure to investigate citizen complaints, and failure to discipline officers, including Karteron. Monteagle's deliberate indifference constitutes a ratification of Karteron's and Raline's misconduct.

98. Plaintiff seeks damages against Karteron, Raline, and Monteagle in the amount of THREE MILLION DOLLARS.

99. Plaintiff seeks punitive damages against Karteron and Raline in the amount of SIX MILLION DOLLARS.

## COUNT TWO:

### MALICIOUS PROSECUTION WITHOUT PROBABLE CAUSE
### (FOURTH AND FOURTEENTH AMENDMENTS)

### September 15, 2025 Incident.

### VIOLATION OF CIVIL RIGHTS UNDER
### COLOR OF LAW 42 USC § 1983
### [Against Karteron, Raline, and Monteagle]

100. Each paragraph of this Complaint is incorporated as if fully set forth herein.

101. The Fourth Amendment to the United States Constitution protects persons from malicious unreasonable seizures without probable cause. The Fourteenth Amendment to the United States Constitution protects against the continued deprivation of liberty through the criminal proceedings caused by the fabricated evidence.

102. By falsely claiming that Plaintiff was causing damage to the patrol vehicle, that Plaintiff tried to flee and was resisting arrest, and that Plaintiff

~ 19 ~

committed the crime of false imprisonment, Karteron subjected Plaintiff to the continued seizure. Raline subjected Plaintiff to the continued seizure by directing the charge of false imprisonment.

103. The charges of false imprisonment, vandalism, and resisting arrest were terminated in Plaintiff's favor.

104. No reasonable officer would have acted in this manner.

105. Monteagle, despite its full knowledge of Karteron's past violent criminal history, continues to employ Karteron despite its full knowledge that the false imprisonment charge was dismissed; that the charge of retaliation was dismissed by the state; and that the resisting arrest and vandalism charges were no-billed by the Marion County Grand Jury. Karteron's past history of fabrications to Murfreesboro Police demonstrated a pattern of fabrication and thus his false statements were intentional, and this past history was known to Monteagle.

106. Monteagle has a pattern and practice of failure to facilitate citizen complaints, failure to investigate citizen complaints, and failure to discipline officers, including Karteron. Monteagle's deliberate indifference constitutes a ratification of Karteron's and Raline's misconduct.

107. Plaintiff seeks damages against Karteron, Raline, and Monteagle in the amount of THREE MILLION DOLLARS.

108. Plaintiff seeks punitive damages against Karteron, and Raline in the amount of SIX MILLION DOLLARS.

## COUNT THREE:

## UNREASONABLE SEIZURE BY EXCESSIVE FORCE
## (FOURTH AMENDMENT)

## September 15, 2025 Incident.

## VIOLATION OF CIVIL RIGHTS UNDER
## COLOR OF LAW 42 USC § 1983
## [Against Karteron, and Monteagle]

109. Each paragraph of this Complaint is incorporated as if fully set forth herein.

110. The Fourth Amendment to the United States Constitution protects persons from unreasonable seizures by excessive force.

111. Karteron's physical abuse of the handcuffed Plaintiff was unjustified and unreasonable under the circumstances

112. No reasonable officer would have acted in this manner.

113. Monteagle, despite its full knowledge of Karteron's past violent criminal history, continues to employ Karteron despite its full knowledge that the false imprisonment charge was dismissed; that the charge of retaliation was dismissed by the state; and that the resisting arrest and vandalism charges were no-billed by the Marion County Grand Jury. Karteron's past history of fabrications to Murfreesboro Police demonstrated a pattern of fabrication and thus his false statements were intentional, and this past history was known to Monteagle.

114. Monteagle has a pattern and practice of failure to facilitate citizen complaints, failure to investigate citizen complaints, and failure to discipline

~ 21 ~

officers, including Karteron. Monteagle's deliberate indifference constitutes a ratification of Karteron's misconduct.

115. Plaintiff seeks damages against Karteron, and Monteagle in the amount of THREE MILLION DOLLARS.

116. Plaintiff seeks punitive damages against Karteron in the amount of SIX MILLION DOLLARS.

## <u>COUNT FOUR:</u>

### CONSPIRACY TO VIOLATE CIVIL RIGHTS
### (FOURTH AMENDMENT)

### September 15, 2025 Incident.

### VIOLATION OF CIVIL RIGHTS UNDER
### COLOR OF LAW 42 USC § 1983
### [Against Karteron, Raline, and Monteagle]

117. Each paragraph of this Complaint is incorporated as if fully set forth herein.

118. The Fourth Amendment to the United States Constitution protects persons from unreasonable seizures without probable cause.

119. Plaintiff, by operation of Tennessee law, was lawfully in possession of the semi-tractor trailer operated by Mouton, and Plaintiff had no duty to return the vehicle to Mouton despite Karteron and Raline's demands and threats.

120. Karteron was fully aware that Mouton was free to leave at any time. Raline's "legal analysis" and command to Karteron was without probable cause.

~ 22 ~

121. Despite his full knowledge that Mouton was free to leave, Karteron seized Plaintiff and charged him with the crime of false imprisonment after consulting with Raline and upon Raline's direction. Indeed, Raline directed Karteron to make the criminal charge of false imprisonment against Plaintiff.

122. No reasonable officer would have acted in this manner.

123. Monteagle, despite its full knowledge of Karteron's past violent criminal history, continues to employ Karteron despite its full knowledge that the false imprisonment charge was dismissed; that the charge of retaliation was dismissed by the state; and that the resisting arrest and vandalism charges were no-billed by the Marion County Grand Jury. Karteron's past history of fabrications to Murfreesboro Police demonstrated a pattern of fabrication and thus his false statements were intentional, and this past history was known to Monteagle.

124. Monteagle has a pattern and practice of failure to facilitate citizen complaints, failure to investigate citizen complaints, and failure to discipline officers, including Karteron. Monteagle's deliberate indifference constitutes a ratification of Karteron's and Raline's misconduct.

125. Plaintiff seeks damages against Karteron, Raline, and Monteagle in the amount of THREE MILLION DOLLARS.

126. Plaintiff seeks punitive damages against Karteron and Raline in the amount of SIX MILLION DOLLARS.

**COUNT FIVE**

**UNREASONABLE SEIZURE WITHOUT PROBABLE CAUSE**

~ 23 ~

**September 15, 2025 Incident.**

**SUPERVISORY LIABILITY**

**VIOLATION OF CIVIL RIGHTS UNDER
COLOR OF LAW 42 U.S.C. § 1983
[Against Raline]**

127.   Each paragraph of this Complaint is incorporated as if fully set forth herein.

128.   By ordering the charge of false imprisonment and with explicit knowledge that there was no legal basis, Raline engaged in "reckless or callous indifference" and setting in motion a series of acts he knew would lead to a constitutional violation.

129.   Raline, as the chief of police, was in command of the incident at the Plaintiff's business. By directing Karteron, Raline set in motion the seizure without probable cause.

130.   No reasonable officer would have acted in this manner.

131.   Plaintiff seeks damages against Raline in the amount of THREE MILLION DOLLARS.

132.   Plaintiff seeks punitive damages against Raline in the amount of SIX MILLION DOLLARS.

**COUNT SIX:**

**CONSPIRACY TO VIOLATE CIVIL RIGHTS BY MALICIOUS
PROSECUTION WITHOUT PROBABLE CAUSE
(FOURTH AND FOURTEENTH AMENDMENTS)**

**September 18, 2025 Incident.**

~ 24 ~

## VIOLATION OF CIVIL RIGHTS UNDER
## COLOR OF LAW 42 USC § 1983
## [Against Karteron, and Baker]

133. Each paragraph of this Complaint is incorporated as if fully set forth herein.

134. The Fourth Amendment to the United States Constitution protects persons from malicious unreasonable seizures without probable cause. The Fourteenth Amendment to the United States Constitution protects against the continued deprivation of liberty through the criminal proceedings caused by the fabricated evidence.

135. Baker, as a complaining witness, and Karteron a state actor, conspired to fabricate a felony charge of retaliation for past acts by lying to Deputy Ladd that they were married.

136. Plaintiff avers that the goal of Karteron and Baker was to set the stage to seek a revocation of Plaintiff's bond on the charges arising from the September 15th incident. To be sure, Karteron and Baker also obtained a "no contact order" based upon the conspiracy that Karteron later used to prevent the Plaintiff from attending a Board meeting.

137. Plaintiff seeks damages against Karteron and Baker in the amount of THREE MILLION DOLLARS.

138. Plaintiff seeks punitive damages against Karteron and Baker in the amount of SIX MILLION DOLLARS.

**COUNT SEVEN**

**DEPRIVATION OF RIGHT TO ASSEMBLE**
**(FIRST AMENDMENT)**

**November 4, 2025 Meeting of the Board**

**VIOLATION OF CIVIL RIGHTS UNDER**
**COLOR OF LAW 42 U.S.C. §1983**

**[Against Karteron, and Monteagle]**

139. Each paragraph of this Complaint is incorporated as if fully set forth herein.

140. The First Amendment protects the right of the people to peaceably assemble and express their views.

141. Karteron, by using the no contact order he and Baker obtained through false statements, prevented the Plaintiff from attending the Board meeting. Indeed, Karteron used a threat of arrest should the Plaintiff had insisted to attend the meeting.

142. No reasonable officer would have acted in this manner.

143. Monteagle, despite its full knowledge of Karteron's past violent criminal history, continues to employ Karteron despite its full knowledge that the false imprisonment charge was dismissed; that the charge of retaliation was dismissed by the state; and that the resisting arrest and vandalism charges were no-billed by the Marion County Grand Jury. Karteron's past history of fabrications to Murfreesboro Police demonstrated a pattern of fabrication and thus his false statements were intentional, and this past history was known to Monteagle.

~ 26 ~

144. Monteagle has a pattern and practice of failure to facilitate citizen complaints, failure to investigate citizen complaints, and failure to discipline officers, including Karteron. Monteagle's deliberate indifference constitutes a ratification of Karteron's and Raline's misconduct.

145. Plaintiff seeks damages against Karteron, and Monteagle in the amount of THREE MILLION DOLLARS.

146. Plaintiff seeks punitive damages against Karteron in the amount of SIX MILLION DOLLARS.

## COUNT EIGHT

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

## TENNESSEE COMMON LAW

### [Against Karteron, Raline, and Baker]

147. Each paragraph of this Complaint is incorporated as if fully set forth herein.

148. The acts averred herein subjected Plaintiff to humiliation before numerous fellow citizens, which caused the Plaintiff great fear that the misconduct would impact his ability to conduct business. To be sure, the improper release of the bodycam footage in violation of state law was an attempt to inflict further mental injury and humiliation on the Plaintiff.

149. Plaintiff sues Karteron, Baker, and Raline in the amount of $750,000 in compensatory damages and $1,500,000 in punitive damages.

**COUNT NINE**

**ASSAULT AND BATTERY**

**TENNESSEE COMMON LAW**

**[Against Karteron]**

150. Each paragraph of this Complaint is incorporated as if fully set forth herein.

151. Karteron's uses of unnecessary force against the Plaintiff were without consent or with lawful purpose.

152. Plaintiff sues Karteron in the amount of THREE MILLION DOLLARS in compensatory damages and SIX MILLION DOLLARS in punitive damages.

**COUNT TEN**

**MALICIOUS PROSECUTION**

**TENNESSEE COMMON LAW**

**[Against Karteron, Raline, and Baker]**

153. Each paragraph of this Complaint is incorporated as if fully set forth herein.

154. Baker and Karteron made false statements to obtain a charge of retaliation for past acts.

155. Karteron and Raline brought a charge of false imprisonment without probable cause.

~ 28 ~

156. Karteron brought a charge of vandalism and resisting arrest without probable cause.

157. All criminal charges were terminated in Plaintiff's favor.

158. Plaintiff sues all three individual defendants in the amount of THREE MILLION DOLLARS in compensatory damages and SIX MILLION DOLLARS in punitive damages.

## COUNT TEN

## CIVIL CONSPIRACY

## TENNESSEE COMMON LAW

### [Against Karteron, Raline, and Baker]

159. Each paragraph of this Complaint is incorporated as if fully set forth herein.

160. Baker and Karteron conspired to obtain a charge of retaliation for past acts.

161. Karteron and Raline conspired to obtain a charge of false imprisonment without probable cause.

162. Plaintiff sues all three individual defendants in the amount of THREE MILLION DOLLARS in compensatory damages and SIX MILLION DOLLARS in punitive damages.

## RELIEF REQUESTED

WHEREFORE, the Plaintiff requests relief as follows:

1) An award of nominal, compensatory, and presumed damages for each violation of Plaintiff's constitutional rights and for violations of state law in the amounts set forth in each count of this Complaint.

2) An award of punitive damages against the individual defendants in the amount set forth in each count of this Complaint, and to award the damages against these defendants both joint and severable.

3) Award Plaintiff his attorney and expert witness fees and all other costs of litigation pursuant to 42 U.S.C. §1988, and under other applicable law;

4) Pre-judgment and post judgment interest;

5) The right to conform the pleadings to the proof and evidence presented at trial; and

6) Such other relief as the Court deems just and equitable.

### JURY DEMAND

Plaintiff hereby demands a trial by jury pursuant to Fed. R. CIV. P., Rule 38(b) on all issues so triable.

Respectfully submitted,

By: /s/ *Robin Ruben Flores*

**ROBIN RUBEN FLORES**
**TENN. BPR #20751**
**GA. STATE BAR #200745**
Attorney for Plaintiff
4110-A Brainerd Road
Chattanooga, TN  37411
O: (423) 267-1575
F: (423) 267-2703
robin@robinfloreslaw.com

~ 30 ~